IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GREAT AMERICAN INSURANCE COMPANY OF NEW YORK, | § § § | |
| Plaintiff / Counter-Defendant, | § § | |
| VS. | § § | CIVIL ACTION NO. 4:09-CV-00603 JURY DEMANDED |
| SMX 98, INC., SPAWMAXWELL COMPANY, L.P., | § § § | |
| Defendants / Counter-Plaintiffs. | § § | |

**SPAWMAXWELL'S RESPONSE TO PLAINTIFF'S SECOND
MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

DE9079D4FD734262: 0001

# TABLE OF CONTENTS

TABLE OF CITATIONS....................................................................................................iv

NATURE AND STAGE OF PROCEEDING.........................................................................1

STATEMENT OF ISSUES AND STANDARD OF REVIEW....................................................2

      Issue No. 1 ..........................................................................................................2

      Standard of Review .............................................................................................2

      Issue No. 2 ..........................................................................................................2

      Standard of Review .............................................................................................2

      Issue No. 3 ..........................................................................................................2

      Standard of Review .............................................................................................2

SUMMARY OF ARGUMENT ...........................................................................................2

STATEMENT OF FACTS .................................................................................................4

    I.      SpawMaxwell purchased a builder's risk insurance policy from GAIC in order to insure its property located in floors 1 through 12 of Memorial Hermann Hospital System's new hospital tower................................4

    II.     Before Hurricane Ike hit, both permanent and temporary measures had been taken to enclose the Tower building. ........................................4

    III.    The term "fully enclosed building" is undefined.......................................8

    IV.    GAIC's investigation of SpawMaxwell's claim ignored persons with knowledge of the building's condition at the time of the hurricane, and GAIC's denial was based on a definition found nowhere in the policy. .........................................................................9

    V.     With GAIC denying coverage, SpawMaxwell was forced to obtain a loan from Memorial Hermann to complete repairs and construction of the Tower........................................................................10

ARGUMENT.................................................................................................................12

    I.      GAIC bears the burden to demonstrate that its exclusion clearly and unambiguously applies to preclude coverage. ................................12

ii

II.   GAIC has not met its burden of proving that the exclusion containing the undefined term "fully enclosed building" clearly and unambiguously precludes coverage. ................................................ 13

   A.   There is more than one reasonable interpretation of property in a "fully enclosed building." ...................................... 13

   B.   The summary judgment evidence demonstrates that there is a fact issue regarding whether SpawMaxwell's property was in a fully enclosed building. ................................................. 15

III.   GAIC is not entitled to summary judgment on SpawMaxwell's Insurance Code claims. ............................................................... 18

   A.   Because GAIC is not entitled to summary judgment in its favor on coverage, it also is not entitled to summary judgment on SpawMaxwell's Insurance Code claims. .............................. 18

   B.   Because GAIC has failed to address all of SpawMaxwell's Insurance Code allegations, summary judgment is improper. ................................................................................. 19

   C.   There is ample evidence raising a fact issue with regard to SpawMaxwell's Insurance Code claims. ..................................... 20

IV.   GAIC is not entitled to a judgment that it is only liable for amounts in excess of the amount Chubb loaned Memorial Hermann. ............................... 23

   A.   GAIC's "other insurance" clause is inapplicable because the GAIC policy and the Chubb policy cover different insureds, insurable interests, and risks of loss. ........................... 24

   B.   Chubb's loan to Memorial Hermann does not create a threat of a windfall. ................................................................. 29

   C.   Alternatively, GAIC's and Chubb's competing "other insurance" clauses cancel each other out, requiring pro-ration. ................................................................................. 29

   D.   *Mid-Continent v. Liberty Mutual* does not entitle GAIC to a dollar-for-dollar credit for sums loaned by Chubb to Memorial Hermann. ............................................................. 31

CONCLUSION ........................................................................................ 33

CERTIFICATE OF SERVICE .................................................................... 34

iii

TABLE OF CITATIONS

<u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..................................................................................................12

*C.D. Henderson, Inc. v. Commercial Union Ins. Co.*,
NO. CIV. 302CV1409K, 2004 WL 67669 (N.D. Tex. 2004) .................................14

*Cargill, Inc. v. Commercial Union Ins. Co.*,
889 F.2d 174 (8th Cir. 1989) .................................................................................31

*Corning Glass Works v. Seaboard Sur. Co.*,
308 A.2d 813 (R.I. 1973)........................................................................................12

*Data Specialties, Inc. v. Transcon. Ins. Co.*,
125 F.3d 909 (5th Cir. 1997) ...................................................................................4

*Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*,
256 S.W.3d 660 (Tex. 2008) .......................................................................12, 14, 15

*First State Ins. Co. v. N. River Ins. Co.*,
77 F.3d 474 (5th Cir. 1995) ...................................................................................30

*Gilbreath v. White*,
903 S.W.2d 851 (Tex. App.—Texarkana 1995, no writ) ......................................26

*Goswick v. Employers' Cas. Co.*,
440 S.W.2d 287 (Tex. 1969) ..................................................................................26

*Hanover Bldg. Materials, Inc. v. Guiffrida*,
748 F.2d 1011 (5th Cir. 1984) ...............................................................................14

*Hardware Dealers Mut. Fire Ins. Co. v. Farmers Ins. Exch.*,
444 S.W.2d 583 (Tex. 1969) ............................................................................29, 30

*Hartford Cas. Ins. Co. v. Executive Risk Specialty Ins. Co.*,
NO. 05-03-00546-CV, 2004 WL 2404382 (Tex. App.—Dallas Oct. 28, 2004, pet.
denied) ....................................................................................................................25

*Hi-Port, Inc. v. Am. Int'l Specialty Lines Ins. Co.*,
22 F. Supp. 2d 596 (S.D. Tex. 1997),
*aff'd*, 162 F.3d 93 (5th Cir. 1998) .........................................................................26

*Homestead Fire Ins. Co. v. DeWitt*,
245 P.2d 92 (Okla. 1952) .......................................................................................14

iv

*Ins. Co. v. Employers Liab. Assurance Corp.*,
  163 F. Supp. 143 (S.D. Cal. 1958) ............................................................31

*Lone Star Heat Treating Co. v. Liberty Mut. Fire Ins. Co.*,
  233 S.W.3d 524 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ........................12

*M.F.A. Mut. Ins. Co. v. Gulf Ins. Co.*,
  445 S.W.2d 829 (Mo. 1969) ................................................................25

*Members Ins. Co. v. English*,
  706 S.W.2d 779 (Tex. App.—San Antonio 1986, no writ) ............................24, 25

*Mid-Continent Ins. Co. v Liberty Mutual Ins. Co.*
  236 S.W.3d 765 (Tex. 2007) ............................................................31, 32

*Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*,
  811 S.W.2d 552 (Tex. 1991) ................................................................12

*Nat'l Union Fire Ins. Co. v. United L.P. Gas Corp.*,
  NO. 01-00-00222-CV, 2002 WL 396533 (Tex. App.—Houston [1st Dist.] Mar.
  14, 2002),
  *withdrawn in part pursuant to settlement*, 2003 WL 22310045..............................30

*Nautilus Ins. Co. v. Country Oaks Apts. Ltd.*,
  566 F.3d 452 (5th Cir. 2009) ................................................................12

*Nutmeg Ins. Co. v. Employers Ins. Co.*,
  NO. CIV.A. 3:04-CV-1762B, 2006 WL 453235 12 (N.D. Tex. Feb. 24, 2006) ..................30

*Peerless Ins. Co. v. Bailey Mortgage Co.*,
  345 F.2d 14 (5th Cir. 1965) ............................................................25, 26

*Safeco Lloyds Ins. Co. v. Allstate Ins. Co.*,
  NO. 04-09-003-22-CV, 2009 WL 4981082 (Tex. App.—San Antonio Dec. 23,
  2009, no pet.) ........................................................................29, 30

*Sec. Ins. Co. v. Pioneer Cas. Co.*,
  449 S.W.2d 158 (Tex. Civ. App.—Houston [1st Dist.] 1969, writ ref'd n.r.e.) ....................30

*St. Paul Fire & Marine Ins. Co. v. Daughtry*,
  699 S.W.2d 321 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.) ........................25

*St. Paul Fire & Marine Ins. Co. v. Prot. Mut. Ins. Co.*,
  607 F. Supp. 388 (S.D.N.Y. 1985) ........................................................25

*State Farm Fire & Cas. Co. v. Reed*,
  873 S.W.2d 698 (Tex. 1993) ............................................................28, 29

v

*State Farm Fire & Cas. Co. v. Simmons*,
   963 S.W.2d 42 (Tex. 1998) ...............................................................21, 22, 23

*State Farm Lloyds v. Nicolau*,
   951 S.W.2d 444 (Tex. 1997) ...................................................................21, 22

*Tex. Farm Bureau Mut. Ins. Co. v. Sturrock*,
   146 S.W.2d 123 (Tex. 2004) ..........................................................................28

*Tex. Mut. Ins. Co. v. Morris*,
   287 S.W.3d 401 (Tex. App.—Houston [14th Dist.] 2009, pet. filed) ...................19

*Tillerson v. Highrabedian*,
   503 S.W.2d 398 (Tex. Civ. App.—Houston [14th Dist.] 1973, writ ref'd n.r.e.) .................26

*Twin City Fire Ins. Co. v. Fireman's Fund Ins. Co.*,
   386 F. Supp. 2d 1272 (S.D. Fla. 2005)
   *aff'd*, 200 Fed. Appx. 953 (11th Cir. 2006) ..........................................................31

*Universe Life Insurance Co. v. Giles*,
   950 S.W.2d 48 (Tex. 1997) ......................................................................19, 22

*Viles v. Sec. Nat'l Ins. Co.*,
   788 S.W.2d 566 (Tex. 1990) ...........................................................................22

Statutes, Rules and Other Authorities

Allan D. Windt, Insurance Claims & Disputes: Representation of Insurance
   Companies & Insureds, § 11:18 (5th ed.) ...........................................................26

RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY (2001) ........................13, 14

TEX. INS. CODE ANN. § 541.060 (Vernon 2009) ...............................................19

TEX. INS. CODE ANN. § 554.002 (Vernon 2009) ...............................................12

TEX. INS. CODE ch. 541 ...........................................................................19, 20

TEX. INS. CODE ch. 542 ................................................................................19

TEX. PATTERN JURY CHARGES .................................................................19, 23

THE OXFORD AMERICAN COLLEGE DICTIONARY 445 (2002) ................................13

DE9079D4FD734262: 0001

## NATURE AND STAGE OF PROCEEDING

Plaintiff, Great American Insurance Company of New York ("GAIC"), filed this lawsuit on February 27, 2009 against defendants SpawMaxwell Company, L.P. (n/k/a SpawMaxwell Company, L.L.C., a Balfour Beatty Company) and SMX 98, Inc. ("SpawMaxwell").[1]  Among other things, GAIC seeks a declaratory judgment that the builder's risk insurance policy it sold to SpawMaxwell excludes damages to SpawMaxwell's property caused by Hurricane Ike. SpawMaxwell answered the lawsuit on April 7, 2009, and SpawMaxwell Company, L.P. asserted counterclaims for breach of contract, unfair settlement practices under Chapter 541 of the Texas Insurance Code, and failure to make prompt payment under Chapter 542 of the Texas Insurance Code.

On November 13, 2009, GAIC filed a motion for summary judgment, arguing that coverage was excluded under the policy at issue because SpawMaxwell's damaged property was not in a "fully enclosed building" at the time that the hurricane hit.  GAIC also sought summary judgment on what it termed SpawMaxwell's "bad faith" claims.  On January 28, 2010, the Court denied GAIC's motion.  GAIC has now filed a second motion for summary judgment on the same issues and has also raised for the first time the issue of an offset under a different policy provision.  SpawMaxwell files this response to GAIC's second motion, urging that the Court once again deny summary judgment.  Docket call is set for July 12, 2010.

---

[1]     SpawMaxwell Company, L.P. converted to a limited liability company and became SpawMaxwell Company, L.L.C. on or about January 1, 2009.  SMX 98, Inc. was the sole member of SpawMaxwell Company, L.L.C. until November 2009, when SMX 98, Inc. sold its ownership interest to Balfour Beatty Construction.  On or about December 16, 2009, SpawMaxwell Company, L.L.C. changed its name to SpawMaxwell Company, L.L.C., a Balfour Beatty Company.  For convenience, this response refers simply to "SpawMaxwell."  Although SMX 98, Inc. is a defendant in GAIC's declaratory judgment action, SMX 98, Inc. is not making a claim under the policy.

1

### STATEMENT OF ISSUES AND STANDARD OF REVIEW

**Issue No. 1:** Whether GAIC is entitled to summary judgment on its contention that Exclusion B.2(f) (the "fully enclosed" exclusion) of its builder's risk policy precludes coverage for Hurricane Ike-related damage because, according to GAIC, SpawMaxwell's property was not in a "fully enclosed building" at the time Ike hit.

**Standard of Review:** GAIC, as the summary judgment movant and the insurer asserting an exclusion, bears the burden of demonstrating that the exclusion's language clearly and unambiguously excludes coverage. The exclusion is construed narrowly and against GAIC as the insurer, and the Court must adopt SpawMaxwell's construction as long as it is reasonable. GAIC also bears the burden of demonstrating that the evidence conclusively shows that SpawMaxwell's property was not in a fully enclosed building.

**Issue No. 2:** Whether GAIC is entitled to summary judgment on SpawMaxwell's Insurance Code counterclaims.

**Standard of Review:** GAIC, as the summary judgment movant, bears the burden of demonstrating that the undisputed facts negate SpawMaxwell's counterclaims.

**Issue No. 3:** Whether, by virtue of the "other insurance" clause in the policy, GAIC is entitled to a judgment that it must pay only in excess of amounts loaned by Federal Insurance Company/Chubb Group of Companies ("Chubb") to Memorial Hermann.

**Standard of Review:** GAIC, as the summary judgment movant, must demonstrate that the "other insurance" clause clearly and unambiguously operates to reduce GAIC's liability to only amounts in excess of the amount loaned by Chubb. In that regard, GAIC bears the burden of proving that the two policies cover the same insurable interests and protect against the same risks of loss for the benefit of the same insureds.

### SUMMARY OF ARGUMENT

In its latest motion, GAIC still has not met its burden to prove that the "fully enclosed" exclusion clearly and unambiguously excludes coverage. The issue before the Court is whether the evidence raises a fact issue such that a reasonable jury could find that SpawMaxwell's property on floors 1-12 was located in a "fully enclosed building." The witnesses' testimony, various dictionary definitions, and the case law demonstrate that there is more than one reasonable interpretation of the term "fully enclosed building," thus precluding summary judgment. Moreover, the summary judgment evidence shows that SpawMaxwell's property was enclosed in a building with all its permanent sides completed, multiple roofs covering

2

SpawMaxwell's property, and extensive measures taken to enclose the building and SpawMaxwell's property from openings in the crown structure on top of the building. This is more than sufficient evidence to allow a jury to find that SpawMaxwell's property was located in a fully enclosed building.

Although GAIC has not moved for summary judgment on most of SpawMaxwell's Insurance Code counterclaims, the evidence, nonetheless, raises a fact issue. GAIC's corporate representative testified that it denied SpawMaxwell's claim based on GAIC's own, apparently secret interpretation of the exclusion, which is found nowhere in the policy and was not disclosed to SpawMaxwell. Moreover, GAIC failed to contact persons who had personal knowledge of the building's status at the time the hurricane hit (and ignored the statement from one person with personal knowledge that showed that the building was fully enclosed). Under established Texas law, these facts support SpawMaxwell's Insurance Code counterclaims.

GAIC's only new summary judgment ground—the "other insurance" clause—fails as well. Under Texas law, an "other insurance" clause does not apply where, as here, the other insurance covers different insureds, different insurable interests, and different risks of loss. Moreover, even if that were not the case, GAIC failed to disclose to the Court that the alleged other insurance likewise contains an "other insurance" clause. Under such circumstances, the competing "other insurance" clauses cancel each other out, requiring pro-ration. Thus, either way, GAIC is not entitled to summary judgment.

3

## STATEMENT OF FACTS

The Court is familiar with the facts of this case, which were addressed in GAIC's first motion for summary judgment and SpawMaxwell's response. As the facts have not changed significantly, SpawMaxwell incorporates that response, and the facts stated therein, in their entirety.

**I.    SpawMaxwell purchased a builder's risk insurance policy from GAIC in order to insure its property located in floors 1 through 12 of Memorial Hermann Hospital System's new hospital tower.**

Memorial Hermann Hospital System ("Memorial Hermann") hired SpawMaxwell to construct the interiors of floors 1 through 12 of the new Memorial Hermann Hospital Tower (the "Tower"). (Ex. 1 ¶ 2.) To cover potential losses during construction, SpawMaxwell purchased a type of builder's risk policy for interior construction work, known as an inland marine policy with an installation floater, from GAIC. (Ex. 2 at 206-07.)[2] In its second motion for summary judgment, as in its first motion, GAIC relies on Exclusion B.2(f), which provides that GAIC "will not pay for a 'loss' caused directly or indirectly by . . . [r]ain, sleet, snow, hail, ice or dust to *property not in a fully enclosed building*." (Ex. 26 ¶ B.2(f) (emphasis added).)

**II.   Before Hurricane Ike hit, both permanent and temporary measures had been taken to enclose the Tower building.**

The Tower building has 27 floors. (Ex. 3 ¶ 6; Ex. 4 ¶ 3.) There is an additional structure, often referred to as the "crown," that sits on top of the 27th floor roof. (Ex. 3 ¶ 6; Ex. 4 ¶ 3; Ex. 1 ¶ 11.) The witnesses differ on whether the crown is considered part of the Tower building or a separate structure. Adam Lane, a licensed architect and the Memorial Hermann executive who oversaw the development and construction of the hospital, testified that the crown is separate

---

[2]    Builder's risk insurance is a specific type of insurance issued to insure a building during the course of construction, providing property insurance for a project under construction. *Data Specialties, Inc. v. Transcon. Ins. Co.*, 125 F.3d 909, 914 (5th Cir. 1997).

from the building.  (Ex. 5 at 8-10, 99.)   According to Lane, it is separate because it was constructed separately and has a separate elevator bank on the 28th floor where a person must transfer for entrance and exit.  (*Id.* at 99-105.)   Lane also testified that he considers floors 1 through 12, which is the hospital (as opposed to the office space on other floors), to be a separate building because it has its own central plant, is subject to different code requirements, and has separate mechanical, plumbing, and electrical systems.  (*Id.* at 102.)  Christos Kapetanakis (a/k/a Chris Kay) ("Kay"), who has over 20 years experience in the construction industry and served as the project executive for IrvineDCS Team LLC, who facilitated the design and construction of the hospital build-out on Memorial Hermann's behalf, characterized the building as "topping out" at the 27th floor, with the crown being a separate additional structure that he likened to a bridge connection or a canopy overhang, with a totally different set of drawings and a separate permit.  (Ex. 6 at 50-52, 232-33; Ex. 3 ¶¶ 2-4.)  On the other hand, James Bryant, President of Anslow Bryant Construction Ltd., the general contractor for the Tower exterior, characterized the crown as part of the building, but recognized that people have different opinions on this issue.  (Ex. 7 at 41, 69-70.)

The Tower building has three roofs—one above the third level, one above the 12th level, and one above the 27th level.  (Ex. 3 ¶ 7.)  Each floor of the building is separated by a concrete slab.  (*Id.* ¶ 8.)  The exterior walls are constructed from concrete panels.  (*Id.* ¶ 9; Ex. 4 ¶ 3.)  The Tower building has exterior windows, and the north side also has a curtain wall of windows. (Ex. 3 ¶ 9; *id.* Ex A; Ex. 4 ¶ 3.)   The crown structure, which has been described as an architectural feature, sits atop the roof on floor 27 and includes levels 28 through 33.  (Ex. 5 at 99; Ex. 3 ¶ 11.)

DE9079D4FD734262: 0001

SpawMaxwell's property was located on floors 1 through 12 of the building, separated from the crown by fifteen floors of concrete slabs and multiple roofs. (Ex. 3 ¶ 8.) At the time of the hurricane, the floors on which SpawMaxwell was working had been air conditioned for approximately four and a half months. (Ex. 1 ¶ 7.) The pictures attached as Exhibit 8 demonstrate the condition of the floors in which SpawMaxwell's property was located as of September 8, 2008, a few days before Hurricane Ike. It is undisputed that SpawMaxwell had no property in the crown.

At the time that the hurricane hit, the Tower building was enclosed with all its walls and not just one, but three, roofs. (Ex. 3 ¶ 7.) The precast concrete panels had been installed on all four sides of the Tower building. (Ex. 7 at 70.) The permanent windows had been installed, and the curtain wall on the north side of the building had been installed. (*Id.* at 70-71.) The permanent roofs were in place above floors 3 and 12. (*Id.* at 75.) Temporary roofs were in place above the 27th floor of the building and the 33rd floor of the crown. (*Id.*) The only portion of the Tower without permanent windows at the time that Hurricane Ike hit was the crown structure on top of the building. (Ex. 3 ¶ 9, 17; Ex. 7 at 70-71.)

However, multiple temporary measures had been undertaken in order to enclose the building and protect it from the openings in the crown. In or before August 2008, Anslow Bryant enclosed the first floor of the crown (level 28) with a temporary metal enclosure attached to the permanent framing structure. (Ex. 3 ¶ 12; Ex. 4 ¶ 4; Ex. 7 at 83-88.) In addition, the elevator shafts and stairwells on level 28 were completed and fully enclosed with doors. (*Id.*) Around all the penetrations, such as penetrations for elevators or stairwells, partitions were built. (Ex. 7 at 88-89.) As a result, the metal enclosure around the perimeter provided the primary method of enclosure, and around each interior opening was a secondary level of protection. (*Id.*)

6

Around all the doorways to the shafts, Anslow Bryant installed two-by-fours fastened to the concrete, then sealed with caulk, to prevent water from getting into the interior of the building if it passed these primary and secondary levels of protection.[3]  (Ex. 7 at 89.)   Bryant testified that these measures were taken on the 28th floor because that was the only place where the building was still open to anything from the exterior.  According to Bryant, because that was the only area that did not already have temporary protection on it, Anslow Bryant took these measures in order to seal off the first level of the crown from the rest of the building and prevent or minimize water from getting into the lower floors.  (*Id.* at 83-88.)

Immediately prior to the hurricane, Anslow Bryant took additional measures to further seal the 28th level.  The metal surrounding the exterior on level 28 was reinforced by two-by-fours in preparation for the storm.  (*Id.* at 123-24; Ex. 5 at 146-47; Ex. 6 at 190-94.)  There was also plastic sheeting that ran from top to bottom and then folded to the outside.  (Ex. 7 at 123; Ex. 5 at 140-43.)  The enclosure system on level 28 was inspected before the hurricane hit, and it was secured in place.  (Ex. 3 ¶ 14.)   Anslow Bryant confirmed that the precast panels were in place and sealed on floors 1 through 27 by individually inspecting them.  (Ex. 7 at 132.) Workers also further enclosed the staircases (inside the doors) with stud walls with drywall, then sealed the bottoms with silicone and caulk.  (Ex. 5 at 142-43.)  Even though permanent walls were already around the core of the elevators, additional walls were put in as a temporary measure.  (*Id.* at 144-45.)

Finally, even though the building was fully enclosed and the first floor (level 28) of the crown was also fully enclosed, further protective measures were taken.  (*See* Ex. 4 ¶ 6; Ex. 3 ¶ 9.)  Wood platforms were constructed over the stairwells to seal off the 29th level from the 28th

---

[3]      The photographs attached as Exhibit 9, which were taken in August 2008, illustrate these measures.  (Ex. 10 at 69.)

level; and there were also temporary framed walls and wood water dams.  (Ex. 3 ¶ 16; Ex. 5 at 144-45; Ex. 6 at 190-92.)  Where the elevators and stairs transferred (on the 28th floor) to the crown structure, there was temporary protection enclosing the openings.  (Ex. 5 at 83.)

Despite these measures to enclose the building, Hurricane Ike caused significant damage. The hurricane blew away almost all of the metal enclosing the building on the 28th floor.  (Ex. 7 at 136-37; Ex. 6 at 281-82.)  The hurricane broke glass and ripped permanent steel pieces from the structure.  (Ex. 10 at 60-61; Ex. 5 at 236.)  Adam Lane testified that he saw sheet metal from the crown flying around outside at around 4:00 or 5:00 in the morning.  (Ex. 5 at 235-36.)  Chris Kay testified that he saw pieces of the building flying off, and that one piece of the structure flew off and into the parking garage, where it penetrated through the concrete.  (Ex. 6 at 273-84.)  The wind blew permanent air conditioning units off higher roofs and onto lower roofs, creating penetrations in the lower roofs.  (Ex. 3 ¶ 18.)  Significant damage to SpawMaxwell's interior space occurred as a result.

## III.   The term "fully enclosed building" is undefined.

As the Court recognized when it denied GAIC's first motion for summary judgment, "'fully enclosed building' is not a defined term" in the policy.  (Mem. Op. at 5.)  Nor is it a recognized term in the construction industry.  Cory Burkhalter, SpawMaxwell's project manager with fifteen years experience in the construction industry, testified that "fully enclosed" is not a term used in the construction industry and that he had never even heard the term before.  (Ex. 1 ¶¶ 1-2; Ex. 11 at 273.)  Adam Lane and Chris Kay both likewise testified that "fully enclosed building" is not a recognized construction term.  (Ex. 5 at 95; Ex. 3 ¶ 17.)

8

**IV.    GAIC's investigation of SpawMaxwell's claim ignored persons with knowledge of the building's condition at the time of the hurricane, and GAIC's denial was based on a definition found nowhere in the policy.**

After the hurricane, GAIC investigated SpawMaxwell's claim.   However, there is no evidence that GAIC contacted anyone at Anslow Bryant—the entity in charge of both the building's exterior construction and the measures taken to protect the building from the hurricane—before GAIC denied the claim and filed suit. (Ex. 12 at 95-96.)  Moreover, as part of its investigation GAIC received a statement from Chris Kay, who immediately before the hurricane "inspect[ed] the roof and top floors of the new hospital tower building to verify that the building was enclosed, including all temporary measures necessary to prevent water damage from the coming storm." (Ex. 13.)  Kay's statement detailed the many measures taken to protect the building during the storm, then stated, "We completed our inspection and were satisfied that the building was made secure and that the temporary measures taken had enclosed the building and as such were completed." (*Id.*)  After receiving this statement, GAIC never contacted Kay about his inspection and his conclusion that the building was enclosed. (Ex. 12 at 93.)

GAIC also retained an adjuster, Donald Graham, to investigate SpawMaxwell's claim. Graham produced four reports, but GAIC's own retained expert agreed that those reports were "superficial." (Ex. 14 at 55.)  The reports did not assist in determining where the damage was, how much damage there was, and how much it would cost to repair. (*Id.*)  GAIC's retained expert testified that water damage was the most critical thing to investigate, and he would have investigated the water damage and worked with environmental consultant TGE to do so, but that there is no indication that Graham did so. (*Id.* at 99.)  GAIC's expert also would have detailed the location and extent of the damage room by room, but Graham's superficial report did not do that, either. (*Id.* at 102-03.)

9

In a letter dated February 20, 2009, less than three weeks after SpawMaxwell submitted its proof of loss, GAIC denied coverage. (Ex. 15.) GAIC's corporate representative testified that GAIC denied coverage because the Tower was not a "fully enclosed building" at the time the hurricane hit. He testified that a "fully enclosed building" required five things: (1) the building's exterior must be completed, (2) the building must be dried in, (3) the building must be watertight, (4) the building must be waterproof, and (5) the building must be weatherproof. (Ex. 2 at 34, 84, 89-104.) Notably, when GAIC's loss prevention consultant had visited SpawMaxwell's project site several months before the hurricane to survey the premises and identify actual and potential sources of loss, GAIC did not convey any concerns to SpawMaxwell about the condition of the Tower building or any belief that SpawMaxwell was working in a building that was not fully enclosed. (Ex. 1 ¶ 6 & Ex. C.) At virtually the same time that it denied coverage, GAIC filed the present lawsuit seeking a declaration that it is not required to cover the loss.

## V.   With GAIC denying coverage, SpawMaxwell was forced to obtain a loan from Memorial Hermann to complete repairs and construction of the Tower.

SpawMaxwell's contract with Memorial Hermann provided for SpawMaxwell to procure a builder's risk insurance policy, which was to be primary to any insurance maintained by Memorial Hermann and was to include Memorial Hermann as a named insured. (Ex. 16 § 11.3.) Under this arrangement, which is common in the construction industry, both Memorial Hermann and SpawMaxwell were to be protected to the extent of their interests in the property under construction. SpawMaxwell's interest includes its potential liability under the contract for completion of the contract work. (*Id.* § 10.2.5.).

After Hurricane Ike, SpawMaxwell and Memorial Hermann discovered that the GAIC policy was erroneously issued without Memorial Hermann as an additional insured.

10

Immediately upon discovering the error, on November 24, 2008, SpawMaxwell requested that GAIC add Memorial Hermann as a named insured under the policy, in accordance with the intentions of the parties at the time the policy was issued.  (Ex. 17.)  At first, GAIC agreed to rectify the omission and added Memorial Hermann as an insured via Endorsement No. IL 70 02.  (Ex. 18.)  Two weeks later, however, GAIC rescinded the endorsement, claiming that its issuance was a "clerical error."  (Ex. 19.)

At the time of Hurricane Ike, Memorial Hermann insured its facilities under a property insurance policy written by Chubb.  (Ex. 20.)[4]  This policy afforded full limits of liability only for scheduled locations (which were completed facilities).   The project location was not scheduled on the Chubb policy because it was under construction.  (*Id.*)  The Chubb policy also included supplemental "any other location" coverage subject to a $10 million limit.  (*Id.*)  As a result of GAIC's denial of coverage to SpawMaxwell, Memorial Hermann made a claim under the Chubb policy for damage to tenant improvements of $10,505,345, subject to a $1,000,000 deductible.  (Ex. 21.)

After the hurricane, the damage needed to be repaired and the build-out of the hospital facility needed to be completed.   Memorial Hermann and SpawMaxwell entered into a letter agreement through which Memorial Hermann agreed to loan SpawMaxwell the funds to complete that work.[5]  (Ex. 22.)  The agreement provides that SpawMaxwell will pursue its claim under the GAIC policy, and Memorial Hermann will receive 85% of any recovery.  (*Id.*)  Memorial Hermann, in turn, entered into a loan receipt agreement with its insurer Chubb in order

---

[4]      Because the Chubb policy is so voluminous, only the applicable pages are attached.

[5]      The letter agreement essentially deferred any issue as to SpawMaxwell's potential liability to perform repairs.

11

to obtain the funds needed to complete the reconstruction and build-out. [6] (Ex. 23.)

ARGUMENT

I.    **GAIC bears the burden to demonstrate that its exclusion clearly and unambiguously applies to preclude coverage.**

Because GAIC's summary judgment motion relies solely on an exclusion, GAIC, as the insurer, has the burden of proving that the exclusion applies. *E.g., Lone Star Heat Treating Co. v. Liberty Mut. Fire Ins. Co.*, 233 S.W.3d 524, 526 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *see also* TEX. INS. CODE ANN. § 554.002 (Vernon 2009). An intent to exclude coverage must be expressed in "clear and unambiguous language." *Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 668 (Tex. 2008).

Exclusions are "'strictly construed against the insurer and in favor of the insured.'" *Id.* at 668 (quoting *Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d, 552, 555 (Tex. 1991)); *see also Nautilus Ins. Co. v. Country Oaks Apts. Ltd.*, 566 F.3d 452, 454-55 (5th Cir. 2009) (applying Texas law) ("Exclusions are narrowly construed, and all reasonable inferences must be drawn in the insured's favor."). This requirement applies "even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *Evanston Ins.*, 256 S.W.3d at 668. The Court "'must adopt the construction of an exclusionary clause urged by the insured [SpawMaxwell] as long as that construction is not unreasonable.'" *Id.* at 668 (quoting *Nat'l Union Fire Ins. Co.*, 811 S.W.2d at 555 (Tex. 1991)). This is particularly true in the context of a motion for summary judgment, in which "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). As long as SpawMaxwell's

---

[6]    Such loan receipt agreements have been commonly used by insurance companies for years and have been held by courts to constitute loans, not payment of the loss. *See, e.g., Corning Glass Works v. Seaboard Sur. Co.*, 308 A.2d 813, 816 (R.I. 1973).

12

construction of the exclusionary clause is reasonable, or as long as the facts are disputed, summary judgment must be denied.

**II.    GAIC has not met its burden of proving that the exclusion containing the undefined term "fully enclosed building" clearly and unambiguously precludes coverage.**

Although GAIC's second motion for summary judgment is more streamlined than the first, upon examination, it raises nothing new to the Court.

**A.    There is more than one reasonable interpretation of property in a "fully enclosed building."**

As has been demonstrated throughout this lawsuit, there is no agreed-upon definition of what it means for property to be located in a "fully enclosed building."  The Court's prior opinion makes clear that it unambiguously does *not* mean what GAIC formerly contended:  that the building must be "dried in," waterproof, or the like.  (Mem. Op. at 6.)  But exactly what the term *does* mean is still in dispute.

As the Court previously recognized, the term "fully enclosed building" is not defined anywhere in the policy.  (*See id.* at 5.)  Nor is it a term commonly used in the construction industry.  Indeed, *none* of the witnesses experienced in the construction industry are familiar with the term.  (Ex. 1 ¶¶ 1-2; Ex. 11 at 273; Ex. 5 at 95; Ex. 3 ¶ 17.)

Dictionary definitions also differ.  One definition of "fully enclosed building" that was GAIC urged at one point is "a completely closed in roofed and walled structure built for permanent use." (Pl.'s Br. in Support of Mot. for Summ. J at 20.)  Other dictionary definitions of "enclose" require only that something be surrounded or closed off on all sides, not covered with a roof.  THE OXFORD AMERICAN COLLEGE DICTIONARY 445 (2002) ("surround or close off on all sides"); RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 640 (2001) ("1. to shut or hem in; close in on all sides.  2.  to surround, as with a fence or wall.").  Even the word "fully" has multiple definitions.  *See* RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 775 (2001)

13

("1.  entirely or wholly.   2.  quite or at least.").   The Fifth Circuit has held that the term "enclosed," used in an insurance policy, is ambiguous.  *Hanover Bldg. Materials, Inc. v. Guiffrida*, 748 F.2d 1011, 1014-15 (5th Cir. 1984) (holding that because policy term "enclosed" was ambiguous, policy must be construed in favor of coverage when building had roof and only two walls covering less than 25% of its sides).

The witnesses testified as to different meanings as well.  Adam Lane testified that he considers a building to be fully enclosed when there is a "skin" wrapped around the building, such as the precast panels in place.  He does not consider a roof or windows necessary for a building to be fully enclosed.  (Ex. 5 at 97-99, 110-11.)  James Bryant defined "enclosed" as "[h]ad walls around them."  (Ex. 7 at 96.)

In addition, there is nothing in *any* of these definitions of "fully enclosed building" to indicate that only permanent, not temporary, structures can fully enclose a building.   As SpawMaxwell's response to GAIC's first motion for summary judgment shows, case law demonstrates that temporary measures are sufficient.  *See C.D. Henderson, Inc. v. Commercial Union Ins. Co.*, NO. CIV. 302CV1409K, 2004 WL 67669 (N.D. Tex. Jan. 13, 2004) (addressing, as fact finder, whether temporary measures had been taken to fully enclose the building); *cf. Homestead Fire Ins. Co. v. DeWitt*, 245 P.2d 92, 94-95 (Okla. 1952) (holding that temporary canvas covering used during construction brought building within terms of policy requiring that the building first sustain actual damage to roof or walls by direct force of wind or hail before coverage was afforded, "since except for the action of the wind the opening was adequately closed [by the temporary covering]").

Texas law is clear:  in order for an exclusion to be effective, it must be expressed in clear and unambiguous language.  *Evanston Ins.*, 256 S.W.3d at 668.  If the exclusion uses terms that

14

are ambiguous, then Texas law requires the Court to adopt SpawMaxwell's construction as long as it is reasonable. *Id.* Based on the dictionary definitions, the Fifth Circuit's interpretation of the word "enclosed," the case law on temporary measures, and the different definitions ascribed by the witnesses, certainly at least *one* of the interpretations discussed above – that SpawMaxwell's property be in a structure that was enclosed on all sides, or that had walls and roofs, or that had all the precast panels in place, or that was enclosed by temporary measures designed to protect the building – is reasonable. Accordingly, summary judgment is improper.

**B.   The summary judgment evidence demonstrates that there is a fact issue regarding whether SpawMaxwell's property was in a fully enclosed building.**

GAIC represents that its motion is based on new evidence obtained now that GAIC has finally deposed persons with knowledge of the condition of the building at the time that the hurricane hit. But the evidence on which GAIC relies does not demonstrate that the facts have changed. GAIC's evidence demonstrates that several permanent windows in the crown structure on top of the building were not installed at the time of the hurricane—a fact that SpawMaxwell has never disputed. That evidence does not, however, demonstrate as a matter of law that the considerable and extensive other measures—some permanent, some temporary—designed to enclose the building before the hurricane arrived would not allow a reasonable jury to find that SpawMaxwell's property was located within a fully enclosed building.[7]

At the time of Hurricane Ike, SpawMaxwell's insured property was located within a building that had all its permanent walls, two permanent roofs, fifteen levels of concrete covering

---

[7]     GAIC recognizes that the Court denied its first summary judgment motion based on the Court's determination "that a fact question existed on whether the '33-story hospital building' was fully enclosed because there was some evidence 'Anslow-Bryant had enclosed the first floor of the crown (level 28) with a temporary metal enclosure attached to the permanent framing structure.'" (Pl.'s Br. in Support of 2d Mot. for Summ. J. at 9.) But GAIC's instant motion fails to show that this fact issue previously recognized by the Court no longer exists. To the contrary, the summary judgment evidence overwhelmingly supports the fact that the first floor of the crown was enclosed in this manner, which, in turn, enclosed the building. (Ex. 3 ¶ 12; Ex. 4 ¶ 4; Ex. 7 at 83-89.)

SpawMaxwell's space, a third temporary roof on top of the building, and a fourth temporary roof on the crown. (Ex. 3 ¶¶ 7-8; Ex. 7 at 70-71, 75.) The precast concrete panels had been installed on all four sides of the building. (Ex. 7 at 70.) The permanent windows had been installed, and the curtain wall on the north side of the building had been installed. (*Id.* at 70-71.) The space had been air conditioned for over four months. (Ex. 1 ¶ 7.) The first floor of the crown had been enclosed with a metal enclosure, then reinforced with two-by-fours and plastic sheeting. (Ex. 7 at 83-89, 123-24.) The stairwells, elevator shafts, and other penetrations had been enclosed and sealed. (Ex. 7 at 88-89.) James Bryant described the primary, secondary, and still an additional level of protection intended to prevent any water from infiltrating from the crown into the interior of the building. (Ex. 7 at 83-88.) These measures were intended to seal the building at the 28th floor. (*Id.*)

GAIC cites selected deposition testimony from James Bryant, Adam Lane, Chris Kay, and William Olsen (an employee of Haley-Greer, who installed the glass in the crown) and contends that this testimony demonstrates that SpawMaxwell's property was not in a fully enclosed building. None of these witnesses, however, actually testified that SpawMaxwell's property was not in a fully enclosed building. When Bryant was asked about the issue, he repeatedly stated that his answer depended on the definition of "enclosed." (*Id.* at 139-45.) He testified that the glass was not 100% installed in the crown—an issue that has never been in dispute in this case—but that he could not say whether it was "enclosed" because it depends on the definition. (*Id.* at 141.) GAIC's counsel continued to press, and finally obtained the testimony on which GAIC relies, in which Bryant did not testify as to the "fully enclosed" term, but rather, merely again, identified the status of the glass installation in the building:

> Q.      . . . At the time of Hurricane Ike, was the tower a fully enclosed building?

DE:9079D4FD734262: 0001

. . . .

> A.      Okay.   Levels 29 through 33 did not have 100 percent of the
>         glass installed.

(*Id.* at 169.)  Bryant also repeatedly testified that he did not have personal knowledge of all the

temporary protective measures that were taken in the crown immediately prior to the hurricane.

(*Id.* at 201-03.)  Bryant's testimony, read as a whole, is not any evidence—much less conclusive

evidence—that SpawMaxwell's property was not in a fully enclosed building.

Both Adam Lane's and Chris Kay's testimony cited by GAIC relates to only the crown.

(Pl.'s Br. in Support of 2d Mot. for Summ. J. at 4-5.)  But GAIC fails to include the fact that

Lane and Kay both testified that they do not consider the crown to be part of the building.  (Ex. 5

at 99-104, 162-63; Ex. 6 at 232-33, 272.)  Moreover, they each testified as to a definition of

"fully enclosed building" that would encompass the Tower building at the time that the hurricane

hit.  (Ex. 5. at 97-99, 110-11; Ex. 3 ¶ 17.)  Kay specifically testified that the building under the

crown was fully enclosed.  (Ex. 6 at 237, 271-72.)  Cory Burkhalter and James Bryant also

testified that the building under the crown was fully enclosed.  (Ex. 11 at 277 (stating that from

the roofline of 27 to the ground was a fully enclosed building); Ex. 7 at 77 (testifying that with

the precast panels, the installed windows, and the temporary roof on the 27th floor, the building

was enclosed below the 27th floor)).  Even GAIC's own expert, which GAIC hired to inspect the

damaged cabinetry, reported that "[s]tories 2, 3, 4, 5, 6 and 7 – where the casegoods were later

installed – were *essentially closed in* at this time."  (Ex. 24 at WSS000075.) (emphasis added).)

William Olsen's testimony is no more compelling on this issue.  When GAIC's counsel

asked if "the outside portion of the crown" was fully enclosed before Hurricane Ike, Olsen asked

for clarification, "Meaning glass and glazing, or meaning –"  GAIC's counsel confirmed that he

meant glass and glazing, and Olsen answered, "No, sir."  (Ex. 10 at 80.)  Again, this testimony is

17

a nonissue; there is no dispute that there were portions of the crown that were incomplete at the time that Hurricane Ike hit.[8]  The question is whether the multiple and extensive measures that were taken to enclose the building are sufficient to raise a fact issue that would allow a reasonable jury to find that SpawMaxwell's property on floors 1-12 was located in a "fully enclosed building."[9]  As the cited evidence demonstrates, a fact issue is raised.

### III.   GAIC is not entitled to summary judgment on SpawMaxwell's Insurance Code claims.

GAIC also has again moved for summary judgment on what it calls SpawMaxwell's "bad faith" claim.  This Court denied GAIC's motion in this regard the first time it filed it, and it should deny this second motion as well.

#### A.   Because GAIC is not entitled to summary judgment in its favor on coverage, it also is not entitled to summary judgment on SpawMaxwell's Insurance Code claims.

GAIC's initial ground for summary judgment on SpawMaxwell's "bad faith" claim is its argument that it properly denied SpawMaxwell's claim under the "fully enclosed" exclusion, so it cannot be liable for bad faith.  SpawMaxwell has demonstrated in Part I why GAIC is not entitled to summary judgment on the coverage issue.  It is not entitled to summary judgment on SpawMaxwell's Insurance Code claims on this basis, either.

---

[8]      Olsen testified that he has no knowledge of the work that was done to enclose the building between September 10, the last time that Haley-Greer was at the construction site, and the morning of September 13 when the hurricane hit. (Ex. 10 at 76-77.)

[9]      GAIC submits that prior to denying the claim, it located and obtained "progress photos taken by an outside photography company, Emporis, very near the time of the alleged loss that clearly and conclusively demonstrated the upper floors of the Tower were open during the relevant time period." (Pl.'s Br. in Support of 2d Mot. for Summ. J. at 11.)  However, the photographs, which are unauthenticated, do not contain a specific date, and appear to have been printed off of a website, do not show the interior of the crown or the measures taken by Anslow Bryant to enclose the interior of the crown before Hurricane Ike. (*Id.* at Ex. 5.)  These photographs are not proper summary judgment evidence and certainly do not establish that SpawMaxwell's property was not in a fully enclosed building at the time Ike hit.

**B.    Because GAIC has failed to address all of SpawMaxwell's Insurance Code allegations, summary judgment is improper.**

Moreover, in moving for summary judgment, GAIC fails to address the majority of SpawMaxwell's statutory bases for liability.  GAIC argues only that it is not liable for breach of its duty of good faith and fair dealing under the test from *Universe Life Insurance Co. v. Giles*, 950 S.W.2d 48 (Tex. 1997):  whether an insurer has breached its duty of good faith by failing to perform when it knew or should have known that its liability was reasonably clear.  (Pl.'s Br. in Support of 2d Mot. for Summ. J. at 10-11.)  But SpawMaxwell has asserted counterclaims for unfair or deceptive acts or practices under Texas Insurance Code Chapter 541 and for failure to make prompt payment under Texas Insurance Code Chapter 542.  (*See* SpawMaxwell's First Am. Answer & Countercl.)

The failure to settle a claim when the insurer's liability has become reasonably clear is only one of several statutory bases for liability under Chapter 541.  *See* TEX. INS. CODE ANN. § 541.060 (Vernon 2009).  Any one of these bases, standing alone, is sufficient to establish liability under Chapter 541.  *See Tex. Mut. Ins. Co. v. Morris*, 287 S.W.3d 401, 409 n.16 (Tex. App.—Houston [14th Dist.] 2009, pet. filed); TEX. PATTERN JURY CHARGE 102.18 & cmt. (noting that a finding of any one of the acts or practices would support recovery).  GAIC's failure to address any of the other bases—including misrepresenting to a claimant a material fact or policy provision relating to coverage, failing to promptly provide a policyholder a reasonable explanation of the basis in the policy (in relation to the facts or applicable law) for the denial of the claim, and refusing to pay a claim without conducting a reasonable investigation with respect to the claim—requires the denial of summary judgment.  In addition, GAIC has wholly failed to move for summary judgment on SpawMaxwell's claim under Chapter 542, which addresses prompt payment of claims.  *See* TEX. INS. CODE ch. 542.

19

C.     **There is ample evidence raising a fact issue with regard to SpawMaxwell's Insurance Code claims.**

With regard to the one provision of Chapter 541 that GAIC does address, GAIC recites the standard from *Giles* and argues that there is no evidence of bad faith.   There is ample evidence, however, to support all of SpawMaxwell's allegations under Chapter 541—both those addressed in GAIC's motion and those that are not.

GAIC denied coverage less than three weeks after SpawMaxwell submitted its proof of loss. (Ex. 15.)  It did so in a letter giving a laundry list of reasons, most of which it now appears to have abandoned.  (*Id.*)  Moreover, GAIC failed to explain many of the myriad bases that it purportedly gave for denial.  (*Id.*)

GAIC's corporate representative's testimony shows that GAIC's actual basis for denying coverage was its own, apparently secret, definition of the term "fully enclosed building," which he testified required the building's exterior to be complete *and* the building to be "dried in" *and* watertight *and* waterproof *and* weatherproof.[10]   (Ex. 2 at 84, 89-104.)  GAIC never informed SpawMaxwell of this secret definition at any time prior to the loss, including when its loss prevention consultant visited the site several months before Hurricane Ike to survey the premises to identify actual and potential sources of loss.  At that time, GAIC never conveyed any concerns to SpawMaxwell about the condition of the Tower or any belief that SpawMaxwell was working in a building that was not fully enclosed.  (Ex. 1 ¶ 6 & Ex. C.)  More importantly, as the Court recognized in its earlier opinion, there is simply no basis, in the policy or elsewhere, to support GAIC's secret definition of "fully enclosed building."  (Mem. Op. at 6.)

---

[10]     He further testified that the only research he did into the meaning of "fully enclosed building" was to consult a dictionary, (Ex. 2 at 71), but GAIC has been unable to identify any dictionary definition that supports inserting these additional requirements in order for a building to be "fully enclosed."

As further evidence that GAIC misrepresented the definition of "fully enclosed building" as a pretext for denying coverage, there is considerable evidence that GAIC's investigation of SpawMaxwell's claim, and in particular its investigation of whether the building was "fully enclosed," was inadequate under the circumstances. Despite purporting to rely on the status of the building to deny coverage, no one from GAIC ever contacted Anslow Bryant—the general contractor in charge of the building's exterior construction—about the condition of the Tower just prior to the hurricane. (Ex. 12 at 95-96.) Nor did GAIC contact Chris Kay after it received his statement detailing his inspection of the building immediately prior to the hurricane and his conclusion that the building was, at that time, enclosed. (*Id.* at 93.) *See State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 449 (Tex. 1997) (discussing evidence that insurer failed to conduct an adequate investigation because it failed to contact engineering company after receiving its report concluding that cause of damage was a leak, which would have afforded coverage); *see also State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 45 (Tex. 1998) (discussing evidence that insurer did not attempt to contact potential arson suspects before denying coverage on the ground that insurer set fire to home).

Finally, GAIC's adjuster, Donald Graham, failed to adequately investigate GAIC's damage claim. GAIC's own expert admitted that Graham's reports were "superficial." (Ex. 14 at 55.) Graham failed to fully and properly document the nature and extent of the damage, failed to calculate estimates for damage repairs, and failed to fully and properly document the locations of water infiltration. (*Id.* at 55, 99, 102-03.) *See Nicolau*, 951 S.W.2d at 449 (discussing evidence that insurer and the engineers it hired—Haag Engineering—did not conduct an adequate investigation due to failure to examine leaking pipe, take core samples, and perform other tests).

DE:9079D4F:D734262: 0001

After SpawMaxwell submitted its proof of loss, GAIC failed to follow up with SpawMaxwell or request any additional information. (Ex. 2 at 166-68.) GAIC contends that Cory Burkhalter's statement demonstrated that the building was not fully enclosed, but GAIC never contacted Burkhalter about the apparent discrepancy between his statement and Kay's statement that the building *was* enclosed. If it had, it would have discovered that Burkhalter had never even been to the crown before the hurricane hit and had no personal knowledge of its condition. (Ex. 11 at 276-77.) *See Simmons*, 963 S.W.2d at 46 (discussing testimony that adjusters should give policyholders benefit of doubt and should contact the policyholder to resolve any apparent conflicts before denying claim). Rather, GAIC denied coverage under the policy less than three weeks after receiving SpawMaxwell's proof of loss, filing suit almost immediately. It was not until months into the litigation—and after it filed its first motion for summary judgment arguing that coverage was excluded because the building was not "dried in," waterproof, etc.—that GAIC first sought testimony from those with personal knowledge of the status of the building when the hurricane hit. *See Viles v. Sec. Nat'l Ins. Co.*, 788 S.W.2d 566, 567 (Tex. 1990) (noting that whether insurer had a reasonable basis for denial is judged by the facts that were before the insurer at the time that the claim was denied).

An insurer cannot escape liability by failing to investigate a claim so that it can contend that liability was never reasonably clear. *Universe Life Ins. Co.*, 950 S.W.2d at 56 n.5; *see also Simmons*, 963 S.W.2d at 44 (holding that insurer cannot insulate itself from bad faith liability by investigating in a manner calculated to construct a pretextual basis for denial).[11] Whether an insurer has breached its duty of good faith and fair dealing is a fact issue. *Simmons*, 963 S.W.2d

---

[11]     GAIC argues that it cannot be liable for bad faith because it hired an additional adjuster and relied on engineers to inspect and investigate SpawMaxwell's claim. But the Texas Supreme Court has made clear that the mere fact that an insurer purports to rely upon an expert report to deny a claim does not automatically foreclose bad faith liability as a matter of law. *Nicolau*, 951 S.W.2d at 448.

22

at 44.   Similarly, whether an insurer has engaged in an unfair or deceptive act or practice

generally involves a question of fact.  *See* TEX. PATTERN JURY CHARGE 102.14, 102.18.  There is

ample evidence that GAIC engaged in unfair or deceptive acts or practices by using a secret

definition to misrepresent the provisions of the policy at issue, failing to provide a reasonable

explanation for its denial of the claim (instead of one based on its own secret definition), failing

to conduct an adequate investigation, and failing in good faith to attempt settlement when, had it

conducted a reasonable investigation, its liability would have been reasonably clear.   GAIC's

motion for summary judgment should be denied.

**IV.   GAIC is not entitled to a judgment that it is only liable for amounts in excess of the amount Chubb loaned Memorial Hermann.**

GAIC argues that it is entitled to a judgment "that its policy is [sic] excess of Chubb's

payment, and to the extent coverage is found to exist, GAIC is only liable for any amount in

excess of the amount Chubb paid for the same property damage at issue."  In essence, GAIC

seeks a dollar-for-dollar credit in the amount paid by Chubb to Memorial Hermann against any

amounts GAIC owes to SpawMaxwell.  But under Texas law, the "other insurance" clause in

GAIC's policy does not operate to bar or limit SpawMaxwell's recovery because SpawMaxwell

and Memorial Hermann do not have the same insurable interests and the GAIC and Chubb

policies cover different risks of loss.[12]   Alternatively, even if the "other insurance" were

applicable, because Chubb's policy contains a competing "other insurance" clause, the two

clauses effectively cancel each other out, and the common law principle of pro-ration by limits

(where the loss is pro-rated between insurance companies based upon respective limits of

liability and deductibles) would apply.  Chubb should not be forced to pay for the bulk for the

damage, while GAIC gets off the hook, simply because Chubb timely performed and GAIC has

---

[12]     GAIC did not raise its "other insurance" clause in its letter denying SpawMaxwell's claim.  (Ex. 15.)

23

been recalcitrant.  Such a result would frustrate the purpose of "other insurance" clauses and lead

to an unjust result.

**A.      GAIC's "other insurance" clause is inapplicable because the GAIC policy and the Chubb policy cover different insureds, insurable interests, and risks of loss.**

GAIC's "other insurance" clause, which GAIC only partially set forth, states:

**F.      Other Insurance**

1.      You may have other insurance subject to the same plan, terms, conditions and provision as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

2.      If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not.  But we will not pay more than the applicable Limit of Insurance.[13]

Section F.2., the clause on which GAIC moves for summary judgment, applies where there is

other insurance for the "same loss or damage."  GAIC argues that, by virtue of this clause, it

must only pay in excess to amounts paid by Chubb.  GAIC's simplistic position is fundamentally

flawed.

When two policies cover different insurable interests or different risks of loss in favor of

different parties, "other insurance" clauses do not apply.  In *Members Insurance Co. v. English*,

the owners purchased a homeowner's policy from Members, and the contractor purchased a

builder's risk policy from Westchester.  706 S.W.2d 779, 791 (Tex. App.—San Antonio 1986,

---

[13]      (Ex. 26.)  Under the terms of F.1., where SpawMaxwell has another policy that duplicates the coverage of the Policy—"the same plan, terms, conditions and provisions" and "covering on the same basis"—GAIC pays its proportional share of the covered loss and SpawMaxwell's other policy covers the remainder.  SpawMaxwell does not have another policy that duplicates the coverage of the Policy.  As such, F.1., which GAIC does not move for summary judgment on, is not applicable.

no writ).   After the home was destroyed by fire, Westchester paid the contractor under its

builder's risk policy, but Members refused to pay the owners under its homeowner's policy.   *Id.*

One of Member's arguments was that, if liable, the "other insurance" clause should apply.   *Id.* at

783-84.   The court disagreed, holding that the builder's risk policy only insured the interest of

the contractor in the property, and that the homeowner's policy was issued only for the owner's

interests in the property.   *Id.* at 783.   The court reasoned:

> Where owners of separate interests in property insure only the interest each has in
> such property, the provisions of an "other insurance" clause respecting
> apportionment of the proceeds of each policy are inapplicable, since "other
> insurance" clauses apply only when the "other" fire insurance covers the same
> property and interest therein against the same risk in favor of the same party.  The
> evils which "other insurance" clauses are designed to prevent are not present
> where each policy insures only the interest held by each separate owner of an
> insurable interest in the property.

*Id.* at 784 (citations omitted).   Other courts have ruled similarly.   *See Hartford Cas. Ins. Co. v.*

*Executive Risk Specialty Ins. Co.*, NO. 05-03-00546-CV, 2004 WL 2404382, at *2 (Tex. App.—

Dallas Oct. 28, 2004, pet. denied) (holding that an "other insurance" clause, which provided that

the policy "shall be excess of and shall not contribute with: (a) any other existing insurance or

self-insurance (whether collectible or not)" was inapplicable because the two policies at issue

covered different risks); *St. Paul Fire & Marine Ins. Co. v. Prot. Mut. Ins. Co.*, 607 F. Supp. 388

(S.D.N.Y. 1985) (determining that although each policy (a landlord's policy and tenant's policy)

purported to be excess as to the other, the pro-rata-by-loss rule did not apply because the

insurable interests and insureds differed); *M.F.A. Mut. Ins. Co. v. Gulf Ins. Co.*, 445 S.W.2d 829,

833 (Mo. 1969) (holding that prorata "other insurance" clauses did not apply and contribution

was not necessary because insurable interests of two insureds (owner with a builder's risk policy

and contractor with standard policy on building) were not identical); *Peerless Ins. Co. v. Bailey*

*Mortgage Co.*, 345 F.2d 14, 18 (5th Cir. 1965) (finding proration clauses in policies did not

25

apply because builder's risk policy and owner's fire policy did not insure same parties or insurable interests; thus, proration would produce the inequitable result of denying the insureds their full indemnity because of a separate insurance contract entered by independent parties to cover a separate insurable interest).

It is undisputed that the GAIC policy and the Chubb policy cover different insureds.[14]   In addition, although the GAIC policy and the Chubb policy cover the same property damage, they cover different insurable interests and insure against different risks in favor of different parties. More than one party may have an independent insurable interest in a single piece of property. *See, e.g., Gilbreath v. White*, 903 S.W.2d 851, 854 (Tex. App.—Texarkana 1995, no writ); *Tillerson v. Highrabedian*, 503 S.W.2d 398, 400 (Tex. Civ. App.—Houston [14th Dist.] 1973, writ ref'd n.r.e.).  As such, more than one insurance policy may cover the same piece of property. GAIC misconstrues its policy as covering only property damage.  In actuality, GAIC's policy, which covers SpawMaxwell's interest as a contractor installing property at the project site, insures two things: (1) damage to its covered property *and crucially* (2) SpawMaxwell's contractual liability for the property of others (including Memorial Hermann).[15]   The dual-nature of this coverage is made clear throughout the policy.   First, Commercial Inland Marine Conditions Paragraph E. Loss Payment, which provides that GAIC may defend SpawMaxwell

---

[14]      As a result of GAIC rescinding its endorsement naming Memorial Hermann as an additional insured, Memorial Hermann is not covered under the policy. (Ex. 18.)  Memorial Hermann does not claim that it is owed any benefits under the Policy.  Memorial Hermann made a separate claim for damage to tenant improvements, among other things, under its policy with Chubb as a result of GAIC's denial of coverage. (Ex. 21.)  Likewise, as a result of GAIC's refusal to pay SpawMaxwell's claim, Memorial Hermann agreed to loan SpawMaxwell funds to complete the reconstruction and build-out, and Memorial Hermann, in turn, obtained a loan from Chubb for those funds. (Exs. 22 and 23.)  GAIC cannot use the Chubb loan to Memorial Hermann as a defense against its own obligations to SpawMaxwell.

[15]      The fact that the GAIC policy covers SpawMaxwell's liability for the property of others is critical because SpawMaxwell could not obtain such coverage under a general liability policy which, as a general rule, excludes damage to property in an insured's care, custody, or control. *See* Allan D. Windt, Insurance Claims & Disputes: Representation of Insurance Companies & Insureds, § 11:18 (5th ed.); *Goswick v. Employers' Cas. Co.*, 440 S.W.2d 287, 290 (Tex. 1969); *Hi-Port, Inc. v. Am. Int'l Specialty Lines Ins. Co.*, 22 F. Supp. 2d 596, 599 (S.D. Tex. 1997), *aff'd*, 162 F.3d 93 (5th Cir. 1998).

26

against "suits arising from claims of owners of property," indicates that the policy is intended to cover SpawMaxwell's potential liability to owners of property. (Ex. 26.) Further, Installation Floater Coverage Form Paragraph E.3. "When Coverage Begins and Ends" makes clear that coverage begins at the time when SpawMaxwell first has potential liability in the property ("from the time the covered property is at [SpawMaxwell's] risk") and ends when SpawMaxwell no longer has potential liability (when SpawMaxwell's "interest in the Covered Property ceases").[16] (*Id.*)

Indeed, Memorial Hermann may potentially claim that SpawMaxwell is contractually liable (under the parties' construction contract) for the hurricane damage.[17] SpawMaxwell paid GAIC to insure against and extinguish this potential liability. Chubb's policy, on the other hand, insures Memorial Hermann's ownership interest in the real property located at the project site, as well as other interests, including its personal property, business income, extra expense, and electronic data. The Chubb policy does not, and cannot, insure against SpawMaxwell's potential liability to others (including Memorial Hermann) for damage to others' property because SpawMaxwell is not an insured under that policy. If, as GAIC argues, the Chubb loan effectively extinguished GAIC's obligations, SpawMaxwell would be left exposed, without

---

[16]     Additionally, the "other insurance" clause itself, by referencing "other insurance covering the same loss or damage," distinguishes between damage and loss. In order to give effect to both terms, they must be read as distinct. While "damage" refers to physical property damage, "loss" refers to the second coverage component, namely, SpawMaxwell's potential loss resulting from its potential liability to others.

[17]     For example, Section 10.2.5 of the AIA A201 contract provides that SpawMaxwell "shall promptly remedy damage and loss . . . to property referred to in Paragraphs 10.2.1.2 [the work, materials, and equipment under SpawMaxwell's care, custody and control] and 10.2.1.3 [other property at the site or adjacent thereto] caused in whole or in part by [SpawMaxwell], a Subcontractor, a Sub-subcontractor, or anyone directly or indirectly employed by any of them, or by anyone whose acts they may be liable and for which [SpawMaxwell] is responsible . . . ." (Ex. 16.) Memorial Hermann may potentially allege that under this provision, SpawMaxwell is liable to Memorial Hermann for damage to the work and materials at the project site. SpawMaxwell in no way concedes that it is liable in this or any other manner. For the purpose of this analysis, however, the Court must consider SpawMaxwell's potential liability.

27

insurance coverage for its potential contractual liability.[18]  The Chubb and GAIC policies do not cover "the same loss or damage."

Although Memorial Hermann's proof of loss, which Memorial Hermann submitted to Chubb at about the same time SpawMaxwell submitted its proof of loss to GAIC, included some of the same items and expenses that SpawMaxwell claimed, Memorial Hermann's claim also contained several different items and categories of costs not covered under the GAIC policy. (Ex. 21.)  Those items include Memorial Hermann's own property and equipment damaged by the hurricane, extra expenses for additional power-utility costs, environmental-testing expenses, medical-equipment storage costs, and emergency response and remediation costs.  (*Id.*)  Indeed, the SpawMaxwell claim and the GAIC claim differ by hundreds of thousands of dollars.[19]

Because the GAIC policy and the Chubb policy cover different parties and different insurable interests and protect against different losses, GAIC's "other insurance" clause is not applicable as a matter of law.  Alternatively, the clause is ambiguous as to the term "other insurance"—specifically, whether that term includes amounts paid under an unrelated policy to an unrelated insured, regardless of whether the other insured has the same insurable interest or the policies cover different risks—and must be construed against GAIC and in favor of SpawMaxwell. *See, e.g., Tex. Farm Bureau Mut. Ins. Co. v. Sturrock*, 146 S.W.3d 123, 126 (Tex. 2004) (stating that a contractual provision is ambiguous if it is subject to two or more reasonable interpretations); *State Farm Fire & Cas. Co. v. Reed*, 873 S.W.2d 698, 699 (Tex.

---

[18]    In addition, the loan receipt agreement between Memorial Hermann and Chubb expressly reserves Chubb's right to pursue recovery from SpawMaxwell as Memorial Hermann's subrogee.  In the event that Chubb pursues a subrogation recovery from SpawMaxwell (under a theory that SpawMaxwell has contractual liability to Memorial Hermann for the hurricane damage), if GAIC succeeds in its coverage denial, SpawMaxwell could end up having to pay Chubb the amount of the loan receipt agreement.  Public policy militates against such a scenario—an insurer successfully avoiding its contractual obligation by denying coverage under an "other insurance" clause, thereby exposing its insured to the subrogation rights of another party or that party's insurer.

[19]    SpawMaxwell's claim, as revised, totals $9,924,338.59.  (Ex. 25.)  Memorial Hermann's claim amounts to $10,473,935.00.  (Ex. 21.)

28

1993) (holding that when an insurance policy provision is ambiguous, the ambiguity must be resolved by adopting the construction most favorable to the insured).   Either way, summary judgment is improper.

### B.   Chubb's loan to Memorial Hermann does not create a threat of a windfall.

GAIC argues that unless it receives a full credit for the amount Chubb loaned Memorial Hermann, Memorial Hermann, by virtue of its loan agreement with SpawMaxwell, would recover twice for the same damages from two different insureds.   This allegation is incorrect. The loan receipt agreement between Chubb and Memorial Hermann explicitly requires Memorial Hermann to pay the loan back to Chubb if Memorial Hermann is repaid its loan to SpawMaxwell from a recovery from GAIC.   (Ex. 23.)   Accordingly, there is no threat of double recovery or potential "windfall," as GAIC alleges.[20]   Instead, the loan agreements simply leave the loss with the insurer that contracted to insure it – GAIC.

### C.   Alternatively, GAIC's and Chubb's competing "other insurance" clauses cancel each other out, requiring pro-ration.

Alternatively, even if GAIC's "other insurance" clause were applicable, GAIC's argument would still fail under the long-standing rule that competing "other insurance" clauses are mutually repugnant and, therefore, cancel each other out.   Texas courts have long recognized that when two competing "other insurance" clauses conflict, the clauses should be ignored and the loss must be pro-rated between the two insurance companies in proportion to the amount of insurance provided by their respective policies.[21]   *See id.* at 589-90; *Safeco Lloyds Ins. Co. v. Allstate Ins. Co.*, NO. 04-09-00322-CV, 2009 WL 4981082, at *4-9 (Tex. App.—San Antonio

---

[20]        Similarly, payment by GAIC would not result in a windfall to SpawMaxwell either.  SpawMaxwell is not entitled to recover any amount of the Chubb loan.  Further, under its loan agreement with Memorial Hermann, SpawMaxwell is required to pay Memorial Hermann 85% of all sums recovered from GAIC.  (Ex. 22.)

[21]        This rule is driven by two well-settled principles: (1) that the insured's rights should be given dominant consideration; and (2) that the insured's coverage must be no less than if she had been protected by only one policy. *See Hardware Dealers Mut. Fire Ins. Co. v. Farmers Ins. Exch.*, 444 S.W.2d 583, 589 (Tex. 1969).

DI:9079D4FD734262: 0001

Dec. 23, 2009, no pet.) (applying *Hardware Dealers*); *Nat'l Union Fire Ins. Co. v. United L.P. Gas Corp.*, NO. 01-00-00222-CV, 2002 WL 396533, at *11 (Tex. App.—Houston [1st Dist.] Mar. 14, 2002) ("It is well settled that, when, as here, two policies have repugnant other-insurance provisions covering the same loss, Texas law requires a pro-rata sharing of liability between the insurers, according to the amount of coverage provided by each policy."), *withdrawn in part pursuant to settlement*, 2003 WL 22310045 (Tex. App.—Houston [1st Dist.] Oct. 9, 2003).[22]

Although GAIC emphasizes the "other insurance" clause in its policy, it neglects to disclose that Chubb's policy also contains an "other insurance" clause. GAIC's policy provides:

> If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

(Ex. 26.) Chubb's policy provides:

> If you have any other insurance covering the same loss or damage as is insured against by this policy, we will only pay for the amount of loss or damage which is insured against by this policy in excess of the amount due from such other insurance, whether you can collect on such other insurance or not.

(Ex. 20 at FIC004110.) Like GAIC's "other insurance" clause, Chubb's "other insurance" clause seeks to make Chubb's policy in excess of other insurance covering the same loss or damage. Thus, GAIC and Chubb have competing and conflicting "other insurance" excess clauses. *See Safeco Lloyds Ins. Co.*, 2009 WL 4981082, at *8 (holding that where each policy contains a provision that is reasonably subject to a construction that it conflicts with a provision in the other

---

[22]   *See also Sec. Ins. Co. v. Pioneer Cas. Co.*, 449 S.W.2d 158, 160 (Tex. Civ. App.—Houston [1st Dist.] 1969, writ ref'd n.r.e.); *First State Ins. Co. v. N. River Ins. Co.*, 77 F.3d 474 (5th Cir. 1995) (finding the excess clauses in direct conflict; therefore, in accordance with Texas law, the conflicting provisions were to be ignored and liability prorated); *Nutmeg Ins. Co. v. Employers Ins. Co.*, NO. CIV.A. 3:04-CV-1762B, 2006 WL 453235, at *12 (N.D. Tex. Feb. 24, 2006) (recognizing that Texas law follows the rule that if a conflict would cause a gap in the coverage for the insured, the policies must be prorated).

30

concurrent policy, the conflicting provisions must be ignored).[23]   Indeed, because GAIC insists

that its policy is in excess to Chubb's, and Chubb's policy requires that it be excess to GAIC's, if

the court were to give literal effect to each "other insurance" clause, both SpawMaxwell and

Memorial Hermann would be left without coverage for their loss.   To prevent this unjust result,

the "pro-rata by limits" principle applies.   *See Twin City Fire Ins. Co. v. Fireman's Fund Ins.*

*Co.*, 386 F. Supp. 2d 1272, 1278 (S.D. Fla. 2005), *aff'd*, 200 Fed. Appx. 953 (11th Cir. 2006).

Thus, at most, GAIC is entitled only to a pro-ration of its liability based on its

proportional policy limit and deductible.   Under a pro-rata allocation of those amounts—and

only those amounts—that are covered by both policies, GAIC would owe the vast amount of the

claim.   Indeed, GAIC's limit of liability is $47,767,358 with a deductible of $10,000.   (Ex. 26.)

The Chubb policy has an applicable policy limit of only $10 million and a deductible of $1

million.   (Ex. 20.)   Accordingly, GAIC's proportional share of the loss would be approximately

82-84%, while Chubb's proportional share would be 16-18%.[24]

### D.   *Mid-Continent v. Liberty Mutual* does not entitle GAIC to a dollar-for-dollar credit for sums loaned by Chubb to Memorial Hermann.

GAIC cites *Mid-Continent Ins. Co. v Liberty Mutual Ins. Co.* to support its alternative

theory that because Chubb has made a "voluntary payment" to its insured, Memorial Hermann,

---

[23]      The fact that GAIC's "other insurance" clause and Chubb's "other insurance" clause do not contain identical verbiage is not determinative.   When considering excess clauses, such as those contained in GAIC's and Chubb's policies, courts have found that, regardless of differences in phraseology, where the effect of the clauses is to make each policy excess to the other, the clauses become mutually repugnant and the loss must be pro-rated.   *See, e.g.*, *id.*, at *5 ("A *reasonable interpretation of the language* in the 'other insurance' provisions is that each purports to be excess to the other liability insurance, thereby creating the type of conflict described in Hardware Dealers." (emphasis added)); *Cargill, Inc. v. Commercial Union Ins. Co.*, 889 F.2d 174, 179 (8th Cir. 1989) ("There is no practical difference between the wording or effect of the two clauses.   The conflict inheres in the nature of 'excess' clauses; each is trying to supersede the other.   It follows that neither can supersede the other, i.e., the clauses are mutually repugnant."); *Ins. Co. v. Employers Liab. Assurance Corp.*, 163 F. Supp. 143, 146 (S.D. Cal. 1958) ("Although each is couched in different language, nevertheless, it appears to this Court that in substance they mean the same, which is that if at the time of the accident there is any other insurance covering the loss, then there would be no liability until after the limits have been reached in the other policy.").

[24]      Based simply on policy limits, the division is approximately 82% for GAIC and 18% for Chubb.   If the deductibles are subtracted from the policy limits, the division is approximately 84% for GAIC and 16% for Chubb.

DE:9079D4FD734262  0001

GAIC is excused from performance to its insured, SpawMaxwell. 236 S.W.3d 765 (Tex. 2007). *Mid-Continent* is readily distinguishable.

*Mid-Continent* involved a dispute between two insurers that provided separate commercial general liability policies to the same insured. *Id.* at 768. The two insurers, who did not dispute liability, disagreed on the settlement value of the case. *Id.* at 769-70. Ultimately, Liberty Mutual agreed to settle the case for $2.5 million and demanded that Mid-Continent contribute half. *Id.* at 770. Mid-Continent refused and only agreed to pay $150,000 and, as a result, Liberty Mutual funded the remaining portion of the settlement. *Id.* Liberty Mutual sued Mid-Continent seeking to recover Mid-Continent's pro-rata share of the settlement. *Id.* The court held there was no independent subrogation right under which Liberty Mutual could recover a portion of the settlement it paid. Central to the court's reasoning was the fact that the insured, by way of the settlement, had fully recovered its loss. As such, the insured had no contractual rights that Liberty Mutual could assert in subrogation.

Here, by contrast, SpawMaxwell has not recovered any of its loss. Nor has SpawMaxwell been made whole by Chubb's loan to Memorial Hermann – SpawMaxwell has not received any portion of the sums paid, and Memorial Hermann maintains a potential claim against SpawMaxwell (a claim to which Chubb is contractually subrogated under the loan receipt agreement). Accordingly, SpawMaxwell still potentially faces a $9 million exposure to Chubb's subrogation rights. As such, unlike Liberty Mutual's insured, SpawMaxwell maintains its contractual rights against GAIC. The holding of *Mid-Continent* is, therefore, inapplicable.[25]

---

[25]    *Mid-Continent* is further distinguishable because the insurers in *Mid-Continent* shared a common insured, whereas Chubb and GAIC have different insureds.

32

## CONCLUSION

For the foregoing reasons, defendants SpawMaxwell respectfully requests that the motion for summary judgment be denied.  SpawMaxwell also requests any further relief to which it may be justly entitled.

Respectfully submitted,

By: _George T. Shipley_
George T. Shipley
State Bar No. 18267100
SHIPLEY SNELL MONTGOMERY LLP
4600 First City Tower
1001 Fannin
Houston, Texas 77002
Telephone:  (713) 652-5920
Facsimile:  (713) 652-3057

ATTORNEY FOR SMX 98, INC. AND
SPAWMAXWELL COMPANY, L.P. (n/k/a
SPAWMAXWELL COMPANY, L.L.C., a
BALFOUR BEATTY COMPANY)

OF COUNSEL:

Amy Snell
State Bar No. 24002968
Laina R. Miller
State Bar No. 24037114
Shipley Snell Montgomery LLP
4600 First City Tower
1001 Fannin
Houston, Texas 77002
Telephone:  (713) 652-5920
Facsimile:   (713) 652-3057

Stephen A. Mendel
State Bar No. 13930650
The Mendel Law Firm
1155 Dairy Ashford, Suite 104
Houston, Texas 77079
Telephone:  (281) 759-3213
Facsimile:   (281) 759-3214

33

DE9079D4FD734262: 0001

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent by electronic filing to all counsel of record on March 19, 2010 as follows:

Mr. J. Chad Gauntt
Mr. David P. Andis
GAUNTT, EARL & BINNEY, LLP
1400 Woodloch Forest Dr., Suite 575
The Woodlands, Texas 77380
Telephone: (281) 367-6555
Facsimile:  (281) 367-3705

Mr. Levi J. Benton
STRASBURGER & PRICE, LLP
1401 McKinney St., Suite 2200
Houston, Texas 77010-4035

Attorneys for Great American Insurance
Company of New York

_____
George T. Shipley

DE9079D4FD734262: 0001